Hello, everyone. Case No. 3 is Appeal No. 23-1345, Avanzalia Solar, S.L. v. Goldwind USA, Inc. Good morning, Mr. Dobie. Yeah, good morning, Your Honor. If I could introduce my colleagues, and may it please the Court, I'm with Ricardo Ugarte, Rebecca Guzman, and Gianna Santoro, all for Avanzalia Solar and Avanzalia Panama. Well, we welcome them as we welcome everyone. And because that was so kind of you, I want you to get your full 15 minutes. So, whoever is manning the clock, kindly give Mr. Dobie his full 15 minutes. Thank you. Thank you, Your Honor. There are two aspects of the District Court's decision that I'd like to address this morning in my time. The first is the Court's reading of Illinois law on tortious interference, and the second aspect is the Court's decision to apply comity and collateral estoppel to the Panama agency determination in this case. And if I could begin first with the District Court's summary judgment on Avanzalia's tortious interference claim. And as Your Honors know, the District Court found that Avanzalia had not demonstrated that Goldwind had directed any conduct at Fuller, and Section 766 of the restatement, the Court found that the claim was insufficient. What the District Court missed, and the basis of the appeal on this portion of the claim is that both Illinois law, the Seventh Circuit, and the restatement all have an alternative way to show tortious interference, and that is Section 766A of the restatement. May, may, may, I'm sorry, yeah, because let me just ask you, as to the tort claim that's based on the post access conduct and your citation of Fuller, which you just noted. Yes, Your Honor. And you cited Fuller for the proposition that under Illinois law, it's clear that the plainest performance must be rendered truly impossible, not just more burdensome, not just more expensive. And what I want you to tell us is, do we have that here? Or do the actions here in delaying responses or slow walking approvals just hinder performance, make it more burdensome, but not make it impossible? Yeah, I understand the question, Your Honor, and you're 100% right. The Fuller mentions that in passing, our lead cases, Sholin and Havoco versus Sumitomo, those are kind of our lead cases, but to address your point, it's fundamental here. By depriving us access to the stop stations, my client's performance was absolutely impossible. Our solar plants could not function, we could not perform, and that's actually admitted in the answer, which we quote in full in our opening brief on page 48. Without access to the substation, Your Honor, there's no way that we could perform. It's a complete fundamental breakdown in terms of being able to perform. Completely impossible. And I think that the question is the right one because it is that distinction, Your Honor, that basically makes the distinction in this case versus some other cases where it's just a situation where it's more burdensome, more expensive to perform, things like that. Judge Rovner, in your Amidala case, that's exactly what it was. It was a situation where because of an interference, the plaintiff obtained a smaller amount when they sold their company to a third party, so it was more expensive. Those are those kind of cases, but where it's completely impossible like this, and we do have that. And let's walk through with specificity about which contracts were completely impossible, just to make sure that I understand completely. Yes, Your Honor. You've got these five PPAs. Yes, Your Honor. But it seems to me we're just talking about four of those that were post-access agreement. Is that right or do I have it inverted? So all five of them, it became impossible for us to perform because this is a solar plant that has to connect into this substation, and without the connection, then it's completely impossible to perform any of those five contracts. It was impossible for us to fulfill our license agreement with ASEP. It was impossible for us to go forward whatsoever. Nothing to do with this massive investment that our client had made without access to the substation. The license agreement with ASEP, was that a contract or is that just a license? Well, we think it's a license agreement. I think even Goldwyn refers to, in its brief, they dropped a footnote in their opposition where they talk about some other, the wind plants and so on, and they gave you some public sites to how those eventually, they have licenses with the agreements as well. I think they even call them license agreements or agreements with ATESA. Those are the same type of agreements that we had. So we had agreements with a license agreement with ASEP. We had what's known as a certificate of viability with ATESA. You think that's a contract, too, that would fall under this impossibility theory? We actually believe that all of those do, as well as our right to connect to what's known as the spot market. So like a lot of, and this is why it's important. How are those contracts, if they had not yet come into being? So you have the right, when you have this alternative energy solar power, they're trying to encourage it. Every single kilowatt that you can produce is sold as a matter of law to the spot market. And so our ability to sell to the spot market was absolutely interfered with as a result of this, as well as with our PPA contracts, as well as with the ASEP license. Do you risk inflating 766A and 766B then? 766B is about expectancies. Yes. Which seem to be what the spot, the issue with the spot market customers is about. Yeah, I think Your Honor raises a point that 766B might fit better in many situations if it was kind of unknown perspective. Our view is because it's so definite, you connect and you're going to sell every bit of your power, that it's not just a possibility, it's a like, you know, it's a certainty. And I commend you to their answer, which we quote in full on paragraph 48, I'm sorry, page 48 of our brief, where they state specifically that they understood that connection to the El Coco substation and without it meant we could not sell to PPA customers, to the spot market. It goes back to Judge Rohner, your initial question about impossibility. The whole thing is completely impossible without that connection. There are no Illinois cases, though, that have extended this impossibility theory to restatement 766B. Yeah, I read that in my friend Mr. Blonder's brief and I respectfully disagree. I think the Sholwin case absolutely embraces the impossibility defense. But the impossibility defense is limited to . . . I'm sorry, the impossibility, 766A. And then this court's Havocco decision also relies upon that and we cite another case from the Northern District of Illinois. But Havocco, again, was dealing with claims of torturous interference with contracts. I'm saying, has it been extended 766B? Your Honor, there's not a 766B case. That's, you're 100% right. The logic is that it should extend to 766B. But the important thing . . . But didn't the Illinois Appellate Court already answer that question? There's some mention in the Douglas Theater case that they're skeptical about applying it to 766B. You're correct on that, Your Honor. What about the Bilinski case where the Appellate Court made the determination that it would not extend 766B? Yeah, I . . . Your Honor, I read all of those cases as being that essentially dicta as it related to that specific issue. I think the most important point that this discussion reveals is the District Court did not even engage with this impossibility position, which we argued below. The District Court . . . I guess that's what I'm trying to sparse out. The claim for torturous interference of a contract, and then you also have claims for torturous interference of expectancies. Correct, Your Honor. I'm trying to distinguish with past. We're going . . . If the impossibility theory extends to torturous interference with expectancies. Your Honor, if you find that this is, and we think you should, that this is an impossibility situation, even if it's just to the contract, then the decision would have to be reversed because the District Court did not even engage in this analysis. There's a mention in his opinion. He uses the word impossible. He actually cites the show one, but he conflates, and in fairness to my friends at Goldwin, he conflated and actually required, even in those instances that we show that there's conduct directed to a third party. So, from our perspective then, I think it's . . . Forgive me. Forgive me. When you say he . . . The District Court, Your Honor. Well, the District . . . Wasn't the District Court Judge Ellis? No, the District Court was Judge Canelli, Your Honor. Oh, I'm sorry. Right. Okay. Yes. To begin with. Okay. There's a cite to show one. There's a mention of the word impossible, but the rest of his discussion about it, I think it's just a single sentence. Should it be . . . Should, from your perspective, it be a reverse or a vacate? In other words, should we march through these different things that you say are contracts and determine what's a contract and what's not, or let the District Court do it in the first instance? I think it should be reversed and remanded, Your Honor, on the issue as it relates to tortious interference. I think we've clearly alleged sufficient for the impossibility. I think this Court can make that determination just on the record here, and then . . . How are we able to do that with regards to the contracts that were mentioned earlier, TAMIC, Parna, Kadima, all of the conduct that happened pre-assessment? Yeah. I'm not saying you have to decide that they were interfered with, Your Honor. I think the case has to be remanded for a trial. I mean, that's what we're asking for. You know, you repeatedly argue in the brief that the evidence such as the undertaking agreement reveals a motive to delay and deny access. But I've been wondering why that motive is relevant at all. Doesn't UEP-1 have a right to demand that Avanzalia comply with the precise requirements of the regulations before gaining access? And why would a motive to delay or deter access or to collude with others matter if all that UEP-1 sought was strict compliance with the regulations? So, two points, Your Honor, and I know my time is limited. No, no. It's important. We'll give you the extra time, of course. I appreciate it, Your Honor, because I think it's very important. So, as it relates to the motive, what we alleged and what we alleged in the district court is that the illegal undertaking provided the reason why there was never going to be any access. And the reason that's relevant is specifically in the rulings by the Panamanian regulator. And this is at A-43 of our appendix. You'll see, and it carries over, I think it's at A-26 before. They argued repeatedly, UEP-1, Goldwyn's entity in Panama, they argued repeatedly that they were happy to provide access, that there was no problem with connection. That's the argument. And, in fact, it was 100 percent the contemporaneous emails that we've cited as well as the document. It says no one is going to grant anybody else, other than the three of us, access. That's what, and this is, we had a Panamanian Supreme Court justice. I think it's absolutely clear that that agreement is unlawful. It was concealed from ASEP, and it directly contradicts, even Goldwyn argued in the briefs below that the determination that the access agreement was, blocked them, was at odds with the finding of ASEP. So, it goes directly to one of the key findings in the only resolution that both the district court relied upon on this Colmeny and Cladwell-Estoppel issue. And I know I've got limited time on it, but essentially, Your Honors, if I can, maybe I should reserve my remaining time. No, you're content. You're full time. You finish your thoughts. Okay. So, Your Honor, as it relates to Colmeny and Cladwell-Estoppel, there was a fraud in the only decision that's relied upon by the district court, and that's the July of 2017 resolution. And that resolution said, yes, Avanzalia, you prepared electrical studies back in 2014, but we can't possibly, and the district court and Goldwyn repeatedly argued in the brief, it would be irresponsible for us to connect you to the substation unless you update these studies to take account. But the July 2017 resolution ultimately, at the end of the day, said, and so, if you update these studies, you shall be granted access per the regulation. So, it forced Goldwyn to grant access. That's the meaning of the resolution. What happened later is a different question, but that's what the decision was. Yes, Your Honor, it did say that, yes, if you do all that, you'll have to give access. What our argument is, is that that entire process was a fraud, because guess what? We had our studies back in 2014, and we were updating them as a result of supposedly others beginning construction, that's point one in 2017, and then number two, that there were these five other plants that were going to begin, or actually had access contracts with UEP-1, the Goldwyn entity. Now, but Goldwyn argues that UEP-1 did not offer the email that contained the alleged misrepresentation to ASCP that New Solar Projects had signed access agreements, that it was Avanzalia who attached that email to the request for arbitration. So, if, I mean, if UEP-1 never made the representation, how could one conclude that it obtained the judgment through fraud? And assuming, forgive me, but and assuming any representation as to Solar Projects was false, why would that be a material falsehood, given that the statement that there were wind projects was not false? And probably that alone would have required an updated electrical study. I'm just, yeah. So, let me break that down, Your Honor. So, number one, there were other wind projects that had licenses, and that's what they attached to the brief, from ASAP, TESSA, and so on, but no one else had an access agreement with the substation, with UEP-1. Okay, no one else did. We filed, Goldwyn, Avanzalia, I'm sorry, Avanzalia filed and said specifically, hey, you know, we've been told there's these other access contracts. We have a controversy. We've got to, you know, we've got to bring this proceeding to start, Your Honor. But what happens then is, number one, as it relates to these access contracts, Goldwyn or UEP-1, this is docket 148-1 at pages 470 through 77, we quote this in the brief, they endorse this. They say, hey, Avanzalia, you've got to go back and you've got to redo your studies. You've got to make changes and all the rest of this stuff because there's a resolution, this July 2017 resolution, you have to update it. So, they endorse, they expressly endorse this, even though they knew, Your Honor, that there was absolutely, none of them had access contracts with UEP. Their expert report, which is in A41 and 42. So, I want to make sure I have the record. So, between 2013 and 2017, there were no access granted between that time, from the time of the studies to the time of the order in 2017? No one else had an access agreement with UEP, okay? And only Goldwyn, only Goldwyn knew. So, back to Judge Rogner, your question about what we submitted this saying, there's these others with these access contracts. No one knew. I mean, they're the parties who would sign the access agreements. Goldwyn knew whether they did or didn't have studies. And even now, they're not here telling you that there was an access agreement with anybody else, okay, other than with the regulators. So, the other plants, Judge Pryor, they would have a license or whatever. But an actual agreement, the same thing we were trying to get for the substation, there was no one else during that time period that had an access agreement, just us. So, our studies were valid. So, I want to make sure I understand, just to follow Judge Rogner's question, the misrepresentation was made to whom? So, they have an expert report that is in the appendix. He states that construction is beginning in 2017. That is then a finding of ASAP. So, it's a misrepresentation to ASAP. The ASAP group also, the administrative agency, also said, okay, there's five access agreements or other access agreements. We've got to make room for those. None of that was true. None of that was true, okay. And number three, they were supposedly ready, won, and able to connect us. That was a theme throughout the proceedings. And no one knew about the illegal undertaking that actually said, we're going to block it. No one knew about the emails that we've uncovered. They said, well, they said they're going to enforce this illegal agreement to block things. Your Honor, I know I was trying to reserve some time. But you are going to get your reserved time. It's us who are trying to, you know. Yeah, it's complicated, Your Honor. We're asking you questions. And this is your opportunity. And you know that I will give you your time. So, thank you. Mr. Blonder. I'm going to change your time to 20 minutes. Because I think that would be a lot fairer. I reserve the right to suggest if that's a good idea or a bad idea. But I'll take it, Judge. Thank you. Would you want the 20? Yes, please. I'd be happy to, Judge. Sit down, whatever you want to do. No, I appreciate that. And I'd like to begin by acknowledging my colleague, Mr. Levitt, Ms. Al-Qa'im, who are here with me. And Ms. Saracen, who's sitting in the second row. I have to give credit to Ms. Al-Qa'im and Ms. Saracen, who are the principal authors of our brief. Thank you very much. My goodness, you both have posse's. Give him back his 20, please. Because it's so nice to know who has worked so hard for this day. May it please this court. My name is Steve Blonder. And I'm here on behalf of the Appley Goldwind USA. I'm asking that this court affirm Judge Cannelli's grant of summary judgment. I'm going to start, I guess, with a couple things that Judge Rovner, you touched on one of your questions, but is fundamentally missing from their argument and their brief. They were only entitled to access if they complied with the regulations. That is beyond dispute. ASAP recognizes that. The regulations require that. They didn't comply. They knew from the beginning that they didn't comply. We have the email and the record, and it's in our short appendix from Mr. Ruiz, their consultants, at our short appendix at 42, where he told them in 2015, he says, good morning, the position's well-founded. I point out that the Avanzalia feasibility process, ATESA did not send a study to UEP. And he continues and says, gives them options of either you can go to ASAP or you can just get the studies for them to look at. And he says, if we focus on ASAP, the solution is definitive, although the process takes months. I think UEP and Avanzalia should go to ATESA so that each one can present their concerns. It might be helpful for us to focus on the material misrepresentation where he kind of left off and just kind of build from there and maybe talk through the impossibility theory. Sure. So let's go to the misrepresentation first. And it's interesting. Let's talk about the alleged misrepresentation with respect to other access agreements, okay? Because that's the one Mr. Doby was just focusing on. Number one, that wasn't a Goldwin slash UEP one representation. Number two, their statement of material facts misquotes the exact document that it cites. And it says material because, and it's page 4452 is the page. And what it said there is the translation is there were access agreements at the substation, not with the substation. And that's a material difference because that's what the actual document they cite says. And where it's important is because let's look at this project as a whole. It was originally UEP. They had approval for 338 megawatts connecting to the substation, to build a substation, to connect to the grid. It was for the entire project. The project gets subdivided into UEP, UEP one, and UEP two. UEP one, who we're talking about who owned the substation, and UEP two, which came online beginning in 2014 in terms of its agreements. But UEP one and UEP two only took up 280 megawatts of the substation. So you still had part of the substation for which access was already existing with a TESA through the substation. It was unaccounted for. And that remainder is UEP. And that is what the other projects that had licenses from a TESA is recognized in the ASAP resolution from October 2017. They had access projects. They had licenses and they had access through the original access for the entire area that UEP part, that remainder was owned by Rafael Perez Pire, who was the original developer of the entire project. So the idea that there was a misrepresentation is misguided. First of all, their language is wrong. Again, you can check the documents, 24452. The translation is at the substation, not with the substation. And second, they had access by virtue of the original documents that provided access to the entire project. So there was absolutely no misrepresentation there regarding that. Number three, the misrepresentation that we've been talking about is in Mr. Perez Pire's email that they attached to ASAP. It wasn't UEP one or Goldwin that put any of the information before ASAP. Number four on that point, ASAP and its resolution, the June resolution in section 12.9, continuing through July and October, recognized the topology had changed, the single line diagram of where they were going to connect needed to be redone. It wasn't simply about are there new studies that need to be because new people come online. ASAP says in their decision that the entire thing needs to be updated because the grid from 2014, when the original studies were done, had changed. And that's when we look at the ASAP resolution. So there's this issue of a fraud on it. But you acknowledge the ASAP resolution, July 2017 resolution, does discuss this idea that there are new solar projects that didn't have access agreements. And there are solar projects that hadn't begun. So how do we know? Because it's in there. They discuss it. How do we know that the regulatory authority isn't relying on those factual errors? But it's not a representation that Goldman made, that UEP-1 made. Goldman and UEP-1 never made a representation of these solar projects are there. It's not on us. Whether ASAP got it right or wrong, it's not a fraud perpetrated by UEP-1. What they're trying to do is say, well, maybe ASAP made a mistake somewhere. And then what they're saying is it's UEP-1's fault. But UEP-1 isn't the one that made a representation. And they're almost imparting some duty to correct. Again, they didn't raise it with ASAP. They were in the same position as UEP-1. So why is it that all of a sudden, this is procured by fraud? And by the way, for fraud, we would need clear and convincing evidence of a fraud. The authority says it was within Judge Kennelly's discretion to apply comedy to the ASAP rulings. And he could either do it or not. And within his discretion, even if he did find there was a fraud, he could still give comedy to those decisions. So it's not a mandatory, A, if there's fraud, he can't do it. It's within his discretion. And they would need to show he abused his discretion in doing that. The more important point on this, though, is if we look at what they argued below, and there's some- Do you contest, though? I'm sorry, what? Do you contest that the undertaking, specifically section 2.3, was unlawful? No, we don't. I mean, I'm sorry, we contest it. We don't agree that it is unlawful, number one. Number two, it's an issue that they raised in their initial complaint with ASAP back in 2016. In their initial complaint, and this is in our short appendix, we have it there, they argue that there's some kind of illegal preference given to UEP-2 for access. So they're making reference to it, and ASAP didn't care about it from the beginning of 2016 when the arbitration started through the end. In particular, that is at, it's in the ASAP complaint, where, sorry, it's on page short appendix 03. They say, the third party's, in fact, apparent beneficiaries of an access preference given, granted by UEP-1 in violation of the current regulations. So they allege that in their initial complaint with ASAP in 2016. Again, that's at short appendix 3. It's in paragraph 11, three lines from the bottom of the page. So there's nothing about that that comes into play in terms of the, quote, illegal agreement, which, by the way, has a provision in it that says the agreement has to comply with Panamanian law. So the idea that it was an unlawful agreement, no, we don't accept that premise, and we don't accept their interpretation of the agreement. Number three, they didn't even develop the argument before Judge Cannelli, which goes to the waiver issue. Their entire fraud argument before Judge Cannelli is six lines. It's six lines in their brief, and it's on page six of their summary judgment brief below. And what they say is that we misled ASAP into believing that the five new wind and solar projects were imminently about to connect, such to update the studies. We've addressed that issue. That we allowed ASAP to erroneously believe the new projects had access agreements while affirmatively misrepresenting the new projects were ready to start construction in 2017. And we failed to inform them of our agreement that these two entities were working with UEP-1 behind the scenes to review Panama's electrical studies. They never alleged below to Judge Cannelli that the agreement itself was a fraud on ASAP. I just read you the whole six sentences in their brief. They didn't make that argument. They didn't develop that argument. That argument is waived on appeal because of that. Would it matter? Are any of the allegations material? No, they're not material, number one. Number two, again, they would have to prove them by clear and convincing evidence in the first place. And then the issue is Judge Cannelli within his discretion. I want to stop with that. I'm struggling to understand your view that he would be in Judge Cannelli's discretion if he found that this judgment were procured by fraud. I'm looking at that against the language of Hilton, the Supreme Court, which says we're going to give comedy to these foreign judgments unless some special ground is shown for impeaching the judgment as by showing that it was affected by fraud or prejudice, dot, dot, dot. If that's the case, it should not be given full faith, full credit, and effect. So where are you getting this idea from that Judge Cannelli would have some discretion if fraud were shown? I know your position. There is no fraud. Right. I'm taking some of the recent cases we cited in our brief where we talk about, I don't remember the case off the top of my head, where we talked about that it's within his discretion. For example, the case, if we look at Ingersoll-Rand, even, number one. But number two, if we take the Second Circuit, there's a Second Circuit case that we cite that also gets to that point. But Judge, I understand your point, which is- We're subject to Hilton. Hilton is- Right. And these are cases kind of subsequent to Hilton implying on Hilton. But you're right. We get there by saying, A, there was no fraud. B, they would have had to prove it by clearing convincing evidence. And then C, the decision ultimately of comedy is within Judge Kennelly's discretion. And I take it that your argument is that what Judge Kennelly held was that there was no support in the record for the contention, that the ASCP proceeding was tainted by fraud. That's exactly right. And Judge Kennelly goes so far to say that, that the record does not contain. He says, based on his review of the record, there's no evidence of fraud. And so when we look at Judge Kennelly, so the issue of the fraud as it applies in the comedy is actually a factual determination that Judge Kennelly makes for which he's entitled to do. There are certain decisions with respect to comedy that may be factual and some that are legal. This is a factual one. And so what standard or review would we use for that factual determination? Again, it's going to be an abuse of discretion in terms of because of that, it would have to be that he was just manifest disregard because of it's his discretion to find that fact. And the facts on a comedy analysis are within the district court's purview. It's not an issue that ever goes to the jury. It's an issue that the court makes. Mr. Blunder, is there anything in the allegedly fraudulent representations that would have impacted the requirements of the regulations? Or did any of those representations relate to whether Avanzalia had fulfilled its obligations under it? No, the issue of Avanzalia's abject failure to comply with the regulations, a fact that was known to them from the beginning is unimpacted by this whatsoever. And frankly, they don't dispute at any point that they complied with the regulations. It's an acknowledgement. They didn't provide an access agreement in advance. They didn't, the studies weren't provided for comment by UEP1, the substation owner in advance. Both are absolute requirements to be able to access the grid under the Panamanian electrical regulations. And here, the ASAP, the regulator in Panama, together with the TESA, the entity charged with making the determination with respect to those regulations made that decision. But I think what we're dancing around, and I would kind of need to get a finer point on, is the reason ASAP requested updated studies, and this is the allegation, is because there were misrepresentations made by UEP1 that suggested that updated studies were needed, that you could not provide this access without the updated studies from 2013. And so is it your contention that ASAP got it correct, that there was a need for updated studies in 2017? Our position is that ASAP, whether they got it right or wrong, okay, it doesn't matter, because it wasn't based on a fraud. I understand what the regulation states. It's more helpful for me if you answer my question directly. Sure, our position is that ASAP got it right, that there was a need for studies that the database that they used did not include all the projects that were licensed, as reflected in the October resolution from ASAP. Now, can you tell me why? Because the study that they used in the grid only accounted for the projects that were online, meaning UEP1 and UEP2, and didn't account for the other projects that had been licensed, which is what ASAP was caring about. They weren't included in it, so it needed to be updated. And again, Mr. Ruiz, who was their consultant, told them that in the first place. They knew it. So this wasn't a surprise to anyone. With the time remaining, can you address the 766A issue? Sure, in terms of the tortious interference issue. Yeah, and as you do, maybe you could tell us what you think is the best Illinois case that discusses the principles that the tortious conduct must be directed at third parties, but also discusses impossibility of performance. So I think there's a couple of cases that kind of go to this issue. There's not an Illinois case that talks about impossibility, where it also, there isn't some evidence that the conduct was directed at someone, meaning that the alleged wrongdoer somehow got into a specific relationship and didn't interfere with a specific relationship. What they're essentially arguing is that impossibility reads directing completely out of Illinois law for both 766A and B. And they're saying it doesn't matter. It's basically, hey, so long as you make it impossible, and that's maybe, I guess, foreseeable to you, you can be liable. There is no Illinois case that goes there. We talked about Havoco, which Mr. Doby was referencing. In Havoco, the defendant had a bullseye on the third-party beneficiaries. And third-party businesses. And what they did was they sabotaged those negotiations to secure the third-party contract in exchange for the commission. I think OTR Transport is a case that's worth looking at. Because there, the alleged conduct made it impossible for the performance. But what they did was they dismissed the claim there, it was Judge Durkin, I believe, citing the absence of any communication or something geared toward the prospective clients or customers. What they said is, hey, the fact that it was impossible for you to do it isn't enough. You have to actually interfere or get in the way of that relationship between either the people that there's a contract with or the prospective customer. And if there's no evidence that anyone did that, then, bless you, then there's no twerk here. And so taking that back to our situation. How do we get around the Shulwin case? So Shulwin, first of all, Douglas Theater, which in the second Douglas Theater case, which comes after Shulwin. Douglas Theater, as I mentioned earlier, dealt with torturous interference of expectancies. Shulwin deals with torturous interference of a contract. Those are two separate claims. And so it might be helpful to take one claim at a time. So let's talk about Shulwin. In Shulwin, the defendant's behavior was designed to thwart the third party from moving next door. So there was a specific third party that was targeted, that was impacted by the conduct. The conduct was so targeted at third party, so there goes your directing issue. And second, the court holds  that the neighbors themselves breached the contract. So what happens is impossibility substitutes for the requirement of showing breach of the contract. It doesn't take away a directing requirement. And if you read Shulwin, again, the conduct was aimed at that one party in particular. It wasn't aimed at a hypothetical third party with whom there might be a relationship. So those are expectancies. We have five contracts that were in place at the time of the conduct alleged. And the reason it was impossible, it was impossible for them to complete their obligations to these five contracts because there was no access granted by Goldwyn. And what they would have to show is that Goldwyn was aware of those contracts and specifically acted to make it impossible to perform those contracts. That's a question that the district court didn't answer. But there's no evidence. They never argued that anything was directed, targeted towards those third parties. They never put anything in the record, never made any argument to the district court that Goldwyn slash UEP1's conduct in any way was geared towards, was headed towards, wasn't even contemplating those five contracts. So- But again, the impossibility question is whether or not your conduct prevented them from being able to complete their obligations under those five contracts. Right, and we're saying that the law would require, the law would create a tort under that circumstance that you're asking about, Judge Pryor. If Goldwyn, if there was evidence that Goldwyn was aware of those five contracts- But Goldwyn knows that Avanzalia is not trying to build this station or connect and create this access just for the heck of it. It's so that they can sell electricity to customers. So there've got to be contracts out there. Not necessarily, because in the Panamanian electric market, you either sell under PPAs, Power Purchase Agreements, or to the spot market where you just sell it to the market as a whole. All of those would be contracts that would then be created. But that's not good enough to simply say, you know that it's being done for a customer theoretically out there somewhere. So the fact that it's just impacting theoretical people in the world- But I think what we keep doing is collapsing the two claims. You're talking about expectancies and we're talking about the contracts that were in place. Right, and I'm saying there has to be some knowledge of the particular contracts in place. And Judge Cannelli didn't answer that question because he stopped at the impossibility theory. Right, and I'm saying that, but there's nothing in the record, and they never argued for Judge Cannelli that there was knowledge by Goldwyn slash UEP-1 of any of those contracts in particular, such there's no basis in the record to conclude that UEP-1 interfered with the contracts by directing anything towards those five contracts. I thought on page 58 of your brief, you do concede that you knew about the contract. That's a different contract. That's an issue of TOVA in 2016 and the pre-2017 conduct. It's a different issue, Judge. They're talking about the contract- I'm talking about, were you aware of the contract? You said nowhere below did they argue- Five contracts that post-date 2017. The one contract of TOVA, we're not disputing that we were aware they had a contract with TOVA. That was in 2016, and that's prior to the issues of the ASEP and the COMETI rulings taking out any issue from pre-2017 conduct. The issue they're trying to raise is contracts that were signed after 2017, in 2018, et cetera, where we had no knowledge of those. I disagree that that's their argument, but I understand your position. Well, we'll learn in a minute. Do you want to make a final, anything or? Are you? No. Mr. Brown? No. Okay. Then, thank you very, very much. Well, you know what you've got to answer. Okay. Thank you, Judge Rohner. If I can first go to the point, I think that Judge Pryor, you were asking about knowledge of the different contracts and the like. And again, page 48 of our opening brief, they admit that defendant, this is their answer. They admit their answer. Defendant clearly knew that connecting through the El Coco substation through the access contract was a necessary step to sign the ATESA contract to obtain access to the national grid, which in turn was required for Avenzalea to operate the solar plant pursuant to its license to sell electricity to the customers on the spot market and through the power purchase agreements. So it's direct, it's reasonably foreseeable. It's the exact standard that we cite the case of Deason. I think it's Deason that addresses that issue. Number two, we also cite the ASAP license itself as a contract that's in our motion for summary judgment below. The ASAP license was an agreement in itself. As it related, Judge Rover, to your question about the existing access contracts and whether or not the space was already taken. He said that they had existing access agreements and the like. There were no other contracts with the substation. That's the point. That's what we had to do. And that's what anybody else did. And we cite docket 166-7, exhibit 94. In fact, those three of the other solar plants actually had to bring claims, make claims to get access back in 2020. So there were not anybody else that had contracts with the substation. They had the licenses with the Panamanian regulators. That's what Mr. Blonder is talking about. Actually, an agreement, the answer is no. As it relates to defects in the proceeding in Panama, we strongly disagree with that. I would say I followed to the letter exactly the process that they're supposed to do. A TESA told us you start with the TESA certificate of viability, go to ASAP, and then you get your access agreement. They didn't have an opportunity. They had 10 days to review our studies. They didn't get it, not because we didn't send it to them, they keep talking about breach. They only would take it from a TESA because this is confidential information. We're not allowed to send it to a third party. That's covered in the brief below. But we scrupulously complied. The question on Cholwin and Mr. Blonder's reading of it, that argument that he makes is, oh, it's just a directed tort case. That's the reason why the appellate court reversed the district court. The district court said that the facts that he just walked us through, that that wasn't directed towards, and the Cholwin appellate court said, well, we're going to find impossibility here. And we're going to hold off the tortious interference with contract on that basis. I think, Your Honors. I'm struggling to understand one thing before you go. Yes. How this ASAP license is a contract. By my reading of it, it gives Avanzalia the right to operate a solar panel. It doesn't require Avanzalia to do something vis-a-vis ASAP or require ASAP to do something for Avanzalia, which is what a contract would look like. So just help me understand that. I think that's 100% fair. I think you and I are saying the same thing. Well, no, because you called it a contract. There's cases that call licenses and your rights under a license in agreement with the regulators. And we've cited, yeah, it's Azarbini versus Village of Worth. It's at page 22 of our summary judgment brief. That's my reference to why it would be an agreement. If there's nothing else, thank you very much. You're so welcome. And thanks to Mr. Dobie and thanks to Mr. Blonder. And the case will be taken under advisement.